IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HEADWATERS INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CV 00-RRA-1967-S |
| K-LEE PROCESSING, INC., and ) | |
| CONCORD COAL RECOVERY ) | |
| LIMITED PARTNERSHIP, ) | |
| ) | |
| Defendants/Third-party Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| BIRMINGHAM SYN FUEL, L.L.C., ) | |
| ) | |
| Third-party Defendant. ) | |

**MEMORANDUM OPINION**

Before the Court is the Motion for "Partial Summary Judgment" of the plaintiff, Headwaters Incorporated ("the plaintiff"). (Doc. 41). For the reasons set forth below, the court finds that the motion is due to be granted.

BACKGROUND

Procedural Aspects

The plaintiff filed this action alleging various counts against the defendants, K-Lee Processing, Inc., ("K-Lee") and Concord Coal Recovery Limited Partnership ("Concord"), including a claim for a refund (Count One); breach of contract (Count Two); negligence, including under Alabama Code § 7-7-204 (Counts Three through Five); and for reimbursement (Count Six). (Doc. 1). The sum and substance of the plaintiff's claims is that it overpaid the

defendants for coal fines that were stored on the defendants' site pursuant to a written agreement. The defendants filed a counterclaim to the plaintiff's complaint alleging that it failed to pay the defendants for coal fines that were used to replace fines that were lost due to adverse weather conditions (Count One) and that the plaintiff breached the agreement requiring that the plaintiff purchase twenty thousand (20,000) tons of coal fines per month during the pendency of the agreement (Count Two). (Doc. 11).

The defendants also filed a third-party complaint against Birmingham Syn Fuel, L.L.C. ("BSF"), the assignee of the agreement between the plaintiff and the defendants, asserting a breach of contract claim (Count One) and that BSF failed to pay for coal fines that the defendant/third-party plaintiff had replaced (Count Two).

This matter is before the court on the motion of the plaintiff for partial summary judgment, which relates only to Counts One, Two, and Six of the complaint, and to the defendants' counterclaim. (Doc. 41). The issues have been briefed, and oral argument was conducted by the undersigned on October 6, 2003.

**Facts[1]**

On September 11, 1996, Headwaters Incorporated, formerly known as Covol Technologies, Inc. ("Covol"), K-Lee, and Concord entered into a Supply Agreement, effective December 1, 1996, for the sale and purchase of washed coal fines. The plaintiff was the purchaser and the defendants were the sellers. On March 20, 1997, the parties entered into an

---

[1] The facts are derived from the "Statement of Relevant Summary Judgment Evidence" included in the present motion. (Doc. 41 at 2). They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

2

"Amended and Restated Supply Agreement" ("the Agreement"), effective March 21, 1997. As the name implies, the Agreement amended and restated the earlier agreement for the purchase of coal fines. On or about March 21, 1997, a good faith deposit of $100,000.00 and a letter of credit were delivered to the defendants in satisfaction of Covol's obligations under certain provisions of the Agreement. (*See* Sections 3.6 and 3.7 of the Agreement).[2]

By letter dated April 10, 1997, Covol requested that the coal fines purchased under Covol Purchase Order Number 270 be inventoried and stored at the defendants' plant. The letter further advised, "If you have the ability to sell the material to another buyer rather than to store it for Covol's account, please do so." (Doc. 41 at ¶ 15). Covol Purchase Orders numbered 270, 272, 273, and 275 specified that storage of the coal fines would be at the K-Lee Storage Yard of K-Lee Processing. (*Id.* at ¶ 16). Purchase Orders numbered 273, 275 and 11011 also stated that the orders were made expressly contingent upon the availability of storage space at the defendants' site. (*Id.*).

Upon finding out that the completion of its facility would be delayed, Covol gave written notification of that fact to the defendants by letter dated June 2, 1997. (*Id.* at ¶ 17). In a letter dated June 12, 1997, K-Lee advised Covol that the invoicing of Coal Fines under Purchase Order number 273 could be spread out over two and one-half (2½) months. (*Id.* at ¶ 18). By letter dated June 17, 1997, Covol accepted K-Lee's offer. (*Id.*).

In a letter dated August 27, 1997, the defendants advised Covol, in part, of the following:

> Another issue which we need immediate response on is COVOL's intentions on purchase order for September and the remainder of the year. As we have mentioned we have numerous customers who require a

---

[2] The Agreement is located at document 41, exhibit A.

> minimum of an annual commitment from us. Unless we have a firm commitment for a substantial amount of our production from COVOL we will be forced into long term contracts with our other customers. We have held off as long as possible! **If we do not have a commitment by Friday September 5, 1997, our intent is to enter into other agreements and we will no longer have the ability to deliver the 20,000 tons/month to COVOL.**

(*Id.* at ¶ 19) (emphasis in original).

By letter dated September 5, 1997, Covol notified the defendants that Covol did not have its own storage space, and that the defendants were free to resell any coal purchased by Covol if the defendants did not have storage space. (*Id.* at ¶ 20). In the same letter, Covol further confirmed the defendants' agreement to store an additional 10,000 tons of coal fines.

By facsimile memorandum dated October 3, 1997, K-Lee notified Covol that Purchase Order number 273 was not fully invoiced and that 14,000 tons remained to be invoiced under that Purchase Order. (*Id.* at ¶ 21). K-Lee also noted that K-Lee's assumption was that no coal fines would be assigned to Purchase Order number 275 until the full 20,000 tons had been invoiced under Purchase Order number 273. (*Id.*).

By letter dated October 23, 1997, the defendants attempted to impose a storage fee of $0.50 per ton, effective as of November 1, 1997, on coal fines stored at K-Lee's plant site. (*Id.* at ¶ 22). By letter dated October 27, 1997, pursuant to Section 4.7 of the Agreement, Covol rejected any attempted imposition of storage fees and refused to pay the storage fees not provided for in the Agreement. (*Id.* at ¶ 23). Covol further offered to assist the defendants in finding a buyer for any coal fines that the defendants could not store. (*Id.*). Covol also acknowledged that K-Lee had requested that Covol's coal fines stored at the K-Lee plant site be moved. (*Id.*).

By letter dated December 9, 1997, the defendants notified Covol that Purchase Order

number 275 for 20,000 tons was completely invoiced, that the defendants had no additional outstanding purchase orders to fill for Covol, and requested Covol to advise the defendants as to Covol's intentions. (*Id.* at ¶ 24). In response to this letter, Covol issued Purchase Order number 11011 for 20,000 additional tons, contingent on the availability of storage capacity, on December 19, 1997. (*Id.* at ¶ 25).

On January 30, 1998, Covol issued Purchase Order number 11012 to the defendants for 20,000 more tons at a rate of $30.45 per ton. (*Id.* at ¶ 26). The order stated that it was contingent upon the availability of storage space at the defendants' site. (*Id.*). The defendants invoiced a total of 108,000 tons of Coal Fines at a rate of $29.00 per ton to Covol between March 1997 and February 1998. (*Id.* at ¶ 27). The defendants accepted $3,132,000.00 from the plaintiff for these coal fines. (*Id.*). The defendants assert that they did not at any time advise Covol that the defendants could not sell additional coal fines to Covol because the defendants did not have adequate storage capacity to stockpile the additional material. (*Id.* at ¶ 28).

In February 1998, BSF accepted assignment of the disputed Agreement pursuant to Section 4.6 of the document, and began removing the coal fines originally purchased by Covol and stored at the defendants' site. (*Id.* at ¶ 29). By letter dated June 5, 1998, BSF notified the defendants of a shortage of coal fines. (*Id.* at ¶ 30). By invoice dated July 6, 1998, the defendants invoiced storage fees in the amount of $330,267.00 to BSF. (*Id.* at ¶ 31).

By letter dated July 8, 1998, the defendants notified BSF of a "shortfall" in the Covol fines of approximately 21,767 tons. (*Id.* at ¶ 32). The defendants also advised BSF that they would (1) charge a storage fee in the amount of $0.50 per ton per month for the stored coal fines, totaling $330,267.00, and (2) deliver 10,575 tons by mid-August, in satisfaction of the shortfall

of fines. (*Id.*). By letters dated August 18, 1998, and August 26, 1998, BSF notified Covol that BSF had taken delivery of all Covol fines stored at the defendants' site. (*Id.* at ¶ 33). Covol paid the defendants for 11,000 tons of coal fines that were not available for BSF to retrieve from the defendants' site. (*Id.*).

In a December 1998 meeting and a letter dated April 16, 1999, Covol rejected the defendants' imposition of, and use as an offset, penalties due under the Agreement and storage fees not provided for under the Agreement. (*Id.* at ¶ 34). Covol further demanded that the defendants refund the overpayment for nondelivered coal fines. (*Id.*). The defendants have refused to pay Covol the $324,568.00 it demands. (*Id.*).

The parties agree that the coal fines stored on the defendants' premises are, pursuant to the Agreement, the property of the plaintiff or its assignee. (*Id.* at ¶ 35). The parties also agree that the defendants notified the plaintiff that the coal fines stored on the defendants' premises were being lost due to weather conditions.[3] The parties also agree that the defendants replaced some of the lost coal fines belonging to the plaintiff and that the defendants have not been paid for the replacement coal fines. Additionally, they agree that the plaintiff has not continued to purchase 20,000 tons of coal fines per month during the contract term as specified in the Agreement.[4] They finally agree that the defendant reduced its customer base in order to meet the 20,000 tons per month requirement.[5]

---

[3] The plaintiff disputes that the coal fines were being lost due to weather conditions, but asserts that it is irrelevant to its motion. (Doc. 41 at n.1).

[4] The plaintiff asserts that this point is not relevant to its motion for partial summary judgment. (Doc. 41 at n.4).

[5] The plaintiff again asserts that this point is not relevant to its motion. (Doc. 41 at n.5).

## The Agreement

The pertinent parts of the Agreement are as follows.

Section 1.1 of the Agreement provides in part:

> SCOPE OF AGREEMENT: Buyer desires to assure a continuous supply of appropriate coal fines ("Fines") for its coal fines agglomeration facility to be located in Birmingham, Alabama ("Facility") and Seller is willing and able to provide such Fines. . . .

Section 2.1 of the Agreement provides in part:

> DESCRIPTION OF FINES AND PRICE SCHEDULE: In accordance with the terms of this Agreement, Seller agrees to transfer ownership and deliver to Buyer, and Buyer agrees to accept and pay Seller for washed Fines produced or located at Seller's Plant located at Concord Plant of USS Mining, in Jefferson County, Alabama. The coal specifications shall be approximately 12,500 Btu per ton, not to exceed 14% moisture, not to exceed 10.5% dry ash. The price which Buyer will pay for the Fines meeting the foregoing specifications during the first year of this Agreement is $29.00 per ton . . . A price escalation of 5% may be enacted by the Seller after January 1, 1998, and an additional price escalation of 5% may be enacted by the Seller after January 1, 1999.

Section 2.3 of the Agreement provides in part that "[w]eights shall be determined via certified truck scales certificates at Buyer's facility."

Section 2.5 of the Agreement provides:

> STORAGE OF FINES ON SELLER'S SITE DURING CONSTRUCTION OF THE BUYER'S FACILITY. During Buyer's construction of its Facility, subject to the availability of storage space, Buyer will have the right to store up to sixty thousand (60,000) tons of fines purchased from Seller on Seller's site at Seller's Plant located at Concord Plant of USS Mining, in Jefferson County, Alabama. Buyer will notify Seller of its intent to inventory the fines on Seller's site in writing at the time of ordering such Fines. Upon notification, Seller will segregate the fines as produced into a separate identifiable area, or if Seller has inadequate storage space for the fines ordered, promptly notify Buyer and indicate to Buyer the exact amount of Fines Seller has the capacity to store. So long as Seller does not have adequate storage space for Fines and the Buyer's Facility has not been completed and in operation, Buyer shall not be obligated to purchase additional Fines so long as Buyer likewise does not have adequate storage space for Fines.

> In the event storage is unavailable at either site, Seller shall be permitted to sell Fines to any third party. Fines so segregated will be the property of Buyer and qualify for invoicing in accordance with this Agreement. Any differences between tons invoiced and actual tons delivered will be noted by Buyer based on weights determined by Buyer's scales described in Section 2.3 below as delivered. Truck bills of lading will specify whether delivered product was from current production or from inventory at Seller's site. Buyer will notify Seller of the reconciling tonnage amount within one week of the last inventory delivery to Buyer, and such amount shall be treated as an adjustment on the next invoice issued by Seller. Seller agrees to execute a protective UCC financing statement for the benefit of Buyer reflecting Buyer's ownership of the fines. Buyer agrees that it will remove all such stored Fines as have accumulated at Seller's site within sixty (60) days of the "substantial completion" of the Buyer's Facility (as contemplated under the construction contract relating to the Facility).

Section 3.3 of the Agreement provides that "[p]rices are F.O.B. Seller's Plant."

Section 3.5 of the Agreement provides in pertinent part:

> <u>MUTUAL OBLIGATION TO NOTIFY</u>: Seller shall promptly notify Buyer if Seller plans to shut down its Plant for any reason beyond routine maintenance. Buyer shall promptly notify Seller: (a) if completion of the Facility is expected to occur after June 30, 1997 (and, thereafter, keep Seller reasonably informed of the progress towards completion), and (b) after the Facility is in operation, if Buyer intends to buy less than twenty thousand tons of Fines in any calendar month due to plant shutdown for any reason beyond routine maintenance.

Section 4.1 of the Agreement provides:

> <u>INDEMNIFICATION BY SELLER</u>: Seller hereby acknowledges that the sole payments required from Buyer for the production and delivery of the Fines are the prices contemplated under Section 2.1 hereof, and Seller hereby agrees, jointly and severally, to defend, reimburse, and indemnify Buyer harmless from and against, any and all losses, expenses, costs (including, without limitation, reasonable attorneys' fees and expenses), liabilities, actions, suits or claims arising out of or relating to the production and delivery of the Fines hereunder and/or any federal, state or local taxes (including black lung taxes), reclamation fees or similar governmental impositions, other fees, royalties and similar amounts which are imposed directly or indirectly upon the production and delivery of the Fines hereunder.

Section 4.2 of the Agreement provides:

8

> INDEMNIFICATION BY BUYER. Buyer hereby agrees to defend, reimburse, and indemnify Seller harmless from and against, any and all losses, expenses, costs (including, without limitation, reasonable attorneys' fees and expenses), liabilities, actions, suits or claims arising out of or relating to the transportation of the Fines after loading on the Trucks and the use of the Fines by Buyer and/or any federal, state or local taxes (including black lung taxes), reclamation fees or similar governmental impositions, other fees, royalties and similar amounts which are imposed directly or indirectly upon the transportation of the Fines after loading on the Trucks and the use of the Fines by Buyer.

Section 4.6 of the Agreement permits the plaintiff to assign the contract to BSF.

Finally, Section 4.7 of the Agreement provides:

> COMPLETE CONTRACT; NO ORAL MODIFICATION: This Agreement is intended by the Parties as a final expression of their agreement and supersedes all prior communications, representations and agreements, oral or written, between the Parties with respect to the subject matter contained herein. The Parties also intend this Agreement to be a complete and exclusive statement of the terms of their Agreement. This Agreement may not be modified or terminated orally, and no claimed modifications, rescission or waiver shall be binding on Buyer or the Seller unless in writing signed by a duly authorized representative of Buyer or Seller.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.,* 398 U.S. 133, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex,* 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

The plaintiff advances its motion for partial summary judgment on Counts One, Two, and Six of its Complaint. Count One is a breach of contract action pursuant to section 7-2-711 of the Alabama Code. It states, in part:

> Where the seller fails to make delivery or repudiates...then with respect to the whole if the breach goes to the whole contract (Section 7-2-612), the buyer may cancel, and whether or not he has done so may, in addition to recovering so much of the price as has been paid . . . [r]ecover damages for nondelivery as provided in this article (Section 7-2-713).

ALA. CODE § 7-2-211. The plaintiff alleges that the defendants breached the Agreement by failing to deliver a total of 108,000 tons of coal fines that were invoiced to Covol under Purchase Orders numbered 239, 270, 272, 273, 275, and 11011, and paid for by or on behalf of Covol. Due to the purported breach, Covol alleges it has overpaid the defendants for 11,059.18 tons of coal fines which Covol never received. (Doc. 1 at ¶ 40). Covol further concludes that it has been damaged by this breach in that it overpaid the defendants in the amount of $320,716.22.[6]

---

[6] This sum is derived by multiplying the shorted tons times the contract price of $29.00 per ton.

Count Two similarly alleges that the defendants breached the Agreement by failing to deliver all of the coal fines for which the defendants accepted payment. Specifically, the plaintiff asserts that the defendants were paid $3,132,000.00 for 108,000 tons of coal fines purportedly provided under the Agreement. However, as already noted, the plaintiff asserts that the BSF did not receive approximately 11,000 tons that the plaintiff had paid the defendant for.

Count Six asserts that the defendants are obligated to defend, reimburse, and indemnify Covol for any losses, expenses, costs (including, without limitation, attorneys' fees and expenses), actions or claims arising out of or relating to the production and delivery of the coal fines under Section 4.1 of the Agreement. The plaintiff asserts that the failure to deliver 11,059.18 tons of coal fines to Covol constitutes a loss, expense, cost, action or claim arising out of or related to the production of the coal fines. (Doc. 1 at ¶ 66). The plaintiff concludes that the defendants are therefore obligated to reimburse it for its overpayments and the cost of enforcing the contract, including, but not limited to, attorneys' fees, expenses, and costs.

The defendants assert that the motion for summary judgment turns on whether they are responsible for the approximately 11,000 tons of coal fines paid for by the plaintiff before they were verified by BSF. The defendants further state that the relevant facts on this issue are discussed in paragraphs 35, 36, and 37 of the plaintiff's motion. Specifically, they state that the "(1) fines stored on Defendants' property were the property of Plaintiff or its assignee . . . ; (2) Defendants notified Plaintiff that fines stored on Defendants' premises were being lost due to weather conditions . . . ; and (3) Defendants replaced some lost fines belonging to Plaintiff, and any shortfall in fines was the result of severe weather conditions . . . ." (Doc. 43 at 2). The defendants further point out that the plaintiff disputes the facts set forth in sections "(2)"and

"(3)." (*Id.*). Consequently, the defendants assert that the plaintiff's motion does not satisfy the summary judgment standard because there is a genuine issue as to a material fact. (*Id.*).

The defendants also argue that they placed the fines that the plaintiff claimed it did not receive on the defendants' property as directed by the Agreement. Accordingly, they assert that, pursuant to the Agreement, once the coal fines were placed on the defendants' property, they became the property of the plaintiff. The defendants also note that the loss of the coal fines is not their responsibility because it was due to severe weather conditions occurring after the fines became the property of the plaintiff. The plaintiff, however, asserts that the cause of the loss of coal fines is only related to the defendants' counterclaims. (Doc. 41 at n.1-4). The defendants counter that whether or not the coal fines were lost goes to the defendants' defense to Counts One, Two, and Six of the plaintiff's complaint and not merely the counterclaims. (Doc. 43 at 3).

Central to this dispute is what constitutes the delivery of the coal fines for purposes of the disputed Agreement. Section 2.5 of the Agreement provides that the "Buyer [the plaintiff] will have the right to store up to sixty thousand (60,000) tons of fines purchased from Seller [the defendants] on Seller's site at Seller's Plant . . . Seller will segregate the fines as produced into a separate, identifiable area . . . Fines so segregated will be the property of Buyer and qualify for invoicing in accordance with this Agreement."

The segregated coal fines that were stored at the Seller's Plant are the property of the plaintiff at the time they were placed there premised on the language of the Agreement. However, for purposes of accounting for the same, the Agreement clearly specifies that it is to be done at the time the coal fines are delivered for weighing at the Buyer's scales. (Agreement §§ 2.3 & 2.5). What the agreement fails to protect the defendants against is losses that occur while

12

the coal fines are stored on their property. Although the defendants could have protected themselves against such losses in the Agreement, they failed to do so. Absent such a reservation, the plaintiff is correct in that the weighing for purposes of making an accounting under the Agreement is to be done at the time of delivery at its facility.

The defendants' argument that there is a dispute concerning whether the defendants notified the plaintiff about losses being caused by inclement weather and whether the defendants replaced some lost fines (doc. 43 at 2) is not material on the plaintiff's breach of contract claims, which are advanced in Counts One, Two, and Six. The defendants' arguments are incorrectly premised on the assertion that "[o]nce those fines were placed [on the defendants' property], they became the property of the Plaintiff; therefore, delivery was made." (*Id.*) (underlining in original). Additionally, assuming that the shortfall was due to inclement weather, this does not obviate the plaintiff's right to be reimbursed premised on the weight of the coal fines at the time of delivery at its facility as is specified in the Agreement.

At the hearing on the motion, counsel for the plaintiff directed the court to *Cove Creek Development Corporation v. APAC-Alabama, Inc.,* 588 So. 2d 458 (Ala. 1991) for guidance. In *Cove Creek*, the court stated, in pertinent part, "Where one by his contract undertakes an obligation which is absolute, he is bound to perform within the terms of the contract or answer in damages, despite an act of God, unexpected difficulty, or hardship, because these contingencies could have been provided against by his contract." *Id.* at 462. Although *Cove Creek* is factually distinguishable, it supports the court's conclusion that the defendants failed to protect themselves from the realities presented in this case – that certain coal fines may have been lost due to adverse weather conditions after they were moved by the defendants and segregated for the

13

plaintiff.

Specifically, the court finds that the plaintiff has demonstrated as a matter of law entitlement to damages in the amount of $320,716.22, which constitutes the excess amount paid to the defendants on the coal fines that were not delivered to BSF at the time the coal fines were weighed at the Buyer's facility. Accordingly, the motion for partial summary judgment is due to be granted as to the plaintiff's claims that are advanced in Counts One, Two, and Six of the complaint.

Regarding the defendants' counterclaims, the court finds that the motion is likewise due to be granted. The first counterclaim alleges that the plaintiff failed to pay for the coal fines that were replenished at the plaintiff's request and subsequently "lost into the atmosphere and/or watershed." (Doc. 11, Counterclaim Count One at ¶ 5). The plaintiff alleges that it was under no contractual or legal duty to make the payments requested by the defendant. The defendants counter that the plaintiff "continues either to forget, ignore, or hope that the Court will forget, that the coal fines in question (*i.e.*, lost coal) were the property of the Plaintiff." (Doc. 43 at 3). Therefore, they assert that "[a]ny replacement of those lost fines was a replacement of property lost by Plaintiff. The replacement cost therefore should be borne by the Plaintiff." (*Id.*).

The court agrees with the plaintiff. It had no contractual or legal duty to pay for any replacement coal under the present circumstances. To the contrary, the defendants had a responsibility to reimburse the plaintiff for the overpayments discovered during the weighing or to replace the previously invoiced coal fines. Summary judgment is therefore due to be granted the plaintiff on the defendants' first counterclaim.

Count Two of the counterclaim alleges that the plaintiff "had a duty to purchase from

Defendants/Counter plaintiffs a minimum of twenty thousand (20,000) tons per month during the pendency of the contract," which it failed to do. (Doc. 11, Counterclaim Count Two at ¶¶ 2 & 4). Additionally, the defendants note that premised on the plaintiff's actions, they "reduced their customer base in order to meet the requirements of the agreement between the parties." (*Id.* at ¶ 3).

The plaintiff asserts that the motion for summary judgment is due to be granted as to this breach of contract claim because the Agreement "explicitly provides that '[s]o long as seller does not have adequate storage space for Fines and the Buyer's Facility has not been completed and in operation, Buyer shall not be obligated to purchase additional Fines so long as Buyer likewise does not have adequate storage space for the Fines" (doc. 41 at 15 (citing ¶ 6 therein)) and it notified the defendants on September 5, 1997, that it did not have storage space and that the defendants were free to resell any coal purchased by the plaintiff if the defendants did not have adequate storage space. (*Id.* (citing ¶ 20 therein)). The plaintiff goes on to argue that because it "did not have adequate storage space and its Facility was not in operation and because Covol notified Defendant of these facts, Covol is entitled to" summary judgment. (*Id.* at 16).

The defendant counters that the plaintiff's argument is "disingenuous" because the plaintiff was capable of performing in 1998 after its plant was completed. (Doc. 43 at 4). The plaintiff responds that the defendants ignore paragraph 29 of the "Statement of Relevant Summary Judgment Evidence" which indicates that BSF accepted assignment of the Agreement in February 1998, pursuant to Section 4.6 of the Agreement. Accordingly, the plaintiff asserts entitlement to summary judgment because it did not have the requisite storage space during the relevant period (March 21, 1997, through February 1998) before the assignment.

As noted above, the party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark*, 929 F.2d at 608; see *Adickes*, 398 U.S. at 157. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. In this case, the plaintiff has met the initial burden of showing that there is no genuine issue of fact as to this count. Therefore, the defendants must come forward with some evidence to show there is a genuine issue for trial. This the defendants have failed to do. Although they argue that the plaintiff's facility was operational in 1998, the record fails to demonstrate that this was prior to the assignment of the plaintiff's rights and obligations under the Agreement at the center of this dispute. The defendant does not dispute the propriety of the assignment and, in fact, appears to base his third-party complaint against BSF on the same. Accordingly, in light of this absence of evidence on this critical matter, summary judgment is due to be granted the plaintiff on the defendant's second counterclaim.

## CONCLUSION

For the reasons set forth above, the undersigned finds that the plaintiff's motion for partial summary judgment is due to be granted. An order consistent with this finding will be entered contemporaneously herewith.

**DONE**, this _6th_ day of November, 2003.

_____
JOHN E. OTT
United States Magistrate Judge